UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-61252-CIV-LENARD/DUBÉ

CYNTHIA L. MITCHELL,

    Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Plaintiff (D.E. #16) and the Motion for Summary Judgment filed by the Defendant (D.E. #19) pursuant to a Clerk's Notice of Magistrate Judge Assignment entered by the Clerk of Court, United States District Court for the Southern District of Florida. The issue before this Court is whether the record contains substantial evidence to support the denial of benefits to Plaintiff, Cynthia L. Mitchell (hereinafter "Mitchell" or "Plaintiff").

### I. FACTS

The Plaintiff filed an application for disability insurance benefits, alleging a disability onset date of December 26, 2006. (R. 76-80).[1] The application was denied initially and on reconsideration. (R. 62-64, 67-73). An initial hearing was held on December 5, 2008. (R. 21-42). Following the hearing, the ALJ issued a decision denying the request for benefits. (R. 11-20). A request for review filed with the Appeals Council was denied. (R. 1-4).

---

1. All references are to the record of the administrative proceeding filed as part of the Defendant's answer. At the hearing on December 5, 2008, the Plaintiff amended her onset date of disability to March 27, 2007. (R. 23).

The Plaintiff testified at the hearing on December 5, 2008, that she drove to the hearing by herself. (R. 24). Mitchell also testified she finished the 8th grade and can read and write. The Plaintiff lives with her 14 year old son. (R. 25). According to the Plaintiff, she last worked in July 2005 as a nurse's aide. (R. 25-26). After she stopped working, her oldest son was temporarily disabled due to a brain injury and he went to live with her so she could care for him. When asked by the ALJ what she did for her son, Mitchell responded as follows: "I make his appointments and make sure that his child support was paid, you know, the things that he would regular do.... I'd have to take the responsibility because he didn't remember, he had short memory, he didn't remember nothing." (R. 26). Additionally, Mitchell stated that her only source of income was $90.00 every 2 weeks for child support. (R. 27).

Next, counsel for the Plaintiff asked her what kind of surgery she previously underwent. Mitchell responded that in September 2005, she underwent cervical fusion surgery which involved 5 disks. The surgery took place due to her extreme chronic pain and because she was not able to function in any way. The Plaintiff testified she is an insulin dependent diabetic. (R. 27). After her surgery, Mitchell had physical therapy 3 days a week for about 7-8 weeks, however, she continued having pain after the surgery. Specifically, she described her pain being in her "cervical spine and it goes into my shoulder, into my arms." (R. 28). According to the Plaintiff, she experiences more pain in her right arm because she uses it more; she constantly has shoulder pain; whatever she does with her arm hurts her; and she has tingling pain in her fingers. (R. 28-29). Mitchell claimed to have the most pain in her shoulders. (R. 29).

Additionally, when asked if there is a "revision or follow up surgery," the Plaintiff stated as follows:

> Well, when I explained to the doctor he said I wouldn't want to - - I
> have problem too swallowing and I had explained to them about that,

2

> that, you know, I - - he took, my doctor have to take my medicines that I use to take for diabetes, the pills, because when I swallowed them they would, you know, wedge between my throat. And they said they can do nothing about it, it'll mean reversing the surgery and I sure don't want to do that.

(R. 29). The Plaintiff continued explaining that she still has difficulty swallowing, including food, and for this reason she was put on insulin, not pills. (R. 30).

Mitchell testified she experiences numbness in her legs and feet about 4-5 days a week, and has difficulty balancing and/or walking, which doctors told her it was due to diabetes and neuropathy. (R. 30). Additionally, the Plaintiff testified she gets dizzy when getting up 2-3 times a day, and can stand and/or walk without difficulty for about 15-20 minutes. The Plaintiff stated she tests her blood sugar at home but it is not controlled, therefore, the doctor changed her medication from Lantus to Humalog. (R. 31).

According to Mitchell, she takes 100 units of insulin, which is average; and her A1C (hemoglobin) was 9.8 in July, which is pretty high and 8.4 after July. (R. 32). Then the following colloquy took place between Mitchell and her attorney regarding Mitchell injecting herself:

> Q   Do you inject yourself?
>
> A   Yes
>
> Q   And are you compliant, do you do it every day in the morning and at a.m., p.m.?
>
> A   I'm supposed to do it two times a day.
>
> Q   Do you do it or someone else does it?
>
> A   Sometimes it's my daughter or somebody comes by because I couldn't hardly do it then my stomach. And if somebody comes by I'll ask them to do it in my arm for me because I can't do it in my arms.
>
> A   Why not?

3

> A   Because you'll have to pull it, you have to pull the skin up so you could inject the needles and I'm not able to pull my skin up and then stick the needle at the same time.

(R. 32).

The Plaintiff testified that her blood pressure medication makes her dizzy and gives her "the symptoms... all at the same time;" and the insulin makes her nauseous. The Plaintiff stated she takes her medications. (R. 33). The Plaintiff also stated that her feet and legs swell and she has to elevate them about 3 times a day, "sometimes" for 2 hours. (R. 32-34). Mitchell testified she takes water pills. (R. 34).

According to the Plaintiff, she spends most of her day laying down because it is her only comfortable position. Mitchell stated she cannot sit straight because her lower tail bone hurts and instead she sits at an angle. For this reason, she brought a cushion to the hearing. (R. 34-35). Mitchell further stated she can sit upright for no more than 20 minutes.

Additionally, the Plaintiff testified that when she tries to hold something she has pain and does not have the strength to hold on to it. (R. 35). The Plaintiff also testified that she sometimes goes grocery shopping; sometimes sweeps with a broom; but does not vacuum because she does not have any rugs. Mitchell's daughter washes the floor, dusts and does the heavy household work. The Plaintiff stated she has difficulty sleeping about 3 nights a week and takes muscle relaxers to alleviate the pain in her shoulders, mainly her right shoulder. (R. 36-37).

The Plaintiff testified that when she told a neurosurgeon from Memorial Primary Health Care about her pain, the neurosurgeon told her that he felt it was because of her uncontrolled diabetes. (R. 37). Thereafter, in November, the neurosurgeon sent Mitchell to therapy, but she stopped going because she was in more pain after therapy.

According to the Plaintiff, her condition has not improved at all in 2 years. Mitchell claimed

that her neck and shoulder still hurt and that she takes Advil and Tylenol for the pain. (R. 38). Additionally, she feels tired or fatigued, and her doctor told her she is always tired due to her diabetes. (R. 38-39). The Plaintiff stated she sleeps about 2 hours during the day and spends most of her time at home. When asked if she goes out much, Mitchell responded: "Away from church, no." (R. 39).

The ALJ asked Mitchell if she was under a Workers' Compensation program after her accident. Mitchell stated that she was and that her case settled in January of the previous year. The Plaintiff added that all her therapy and her surgery were done through Workman's Comp. (R. 39).

The following colloquy took place between the ALJ and the Plaintiff regarding the care she provided to her older son:

> Q     And now the work you did caring for your son, was it like other work you'd done in the past?
>
> A     Oh, no, no, Sir.
>
> Q     What was this like, what was the job called?
>
> A     I - - it was more like using my mind, like make his doctor's appointments for him, you know, his - - pay, make sure his child support is paid. It was the thing, the things that he would have to take care of but because he had a brain injury he wasn't able to function and then - -
>
> Q     Did you have to do his laundry and stuff like that?
>
> A     He had a nurse that was coming in to bathe him and stuff after his surgery.

(R. 39-40).

The ALJ also asked Mitchell if she had previously done home health care of any kind, to which she responded, "no." Mitchell reiterated that she was a nurse's aide and her duties included bathing her patients and lifting them from their bed to the wheelchairs. (R. 40). When asked if she

5

was looking for work, the Plaintiff responded that her "status right now is to control... the pain... and so far I'm not able to do that." (R. 41). The Plaintiff testified that her primary physician was Dr. Michel, however, her primary physician had referred her to Dr. Pausik, a neurologist. The Plaintiff added that Dr. Pausik ordered an MRI which showed that surgery would heal her pain. Dr. Vaces performed the surgery. The Plaintiff further testified that she has "a lot of stiffness around the surgery and that is what really [gives] me the pain." According to the Plaintiff, Dr. Pausik said until her diabetes is controlled, she will continue to feel pain. (R. 41).

In addition to the testimony presented at the hearing, medical records were submitted to the ALJ. However, a review of the medical records and the specific issues raised by the Plaintiff in her Motion for Summary Judgment shows the resolution of the issues do not require this Court to specifically set out all the medical evidence in detail. Accordingly, this Court will set out the pertinent medical records only, then proceed to discuss the legal issues involved and will incorporate the facts as appropriate within the arguments presented below.

Records from a follow-up examination by Dr. Lawrence M. Reiss, cardiologist, dated November 8, 2005 reveal that the Plaintiff had been having problems with palpitations, but denied chest pain, nausea, vomiting, fatigue, blurry vision, back or joint pain, joint swelling, diaphoresis or any other cardiac symptoms. Dr. Reiss noted that the Plaintiff complained about continuing neck pain after her recent surgery. (R. 148-151).[2] Upon examination, Dr. Reiss found no bone or joint deformity; and no atrophy, spasticity, involuntary movements, uncoordination or pain. Mitchell was alert and oriented times 3; her motor coordination was intact with no muscle weakness; and her gait and balance intact. (R. 150).

---

2. This Court notes that record 162-168, 184-187, 275-298, 304, 306-319, 321-332 consists of duplicate or triplicate pages.

The assessment impression given by Dr. Reiss was that Mitchell had a resting tachycardia, however, he considered this not to be a cardiac issue but rather due to her surgery and chronic pain or hyperthyroidism or anemia. Dr. Reiss prescribed the Plaintiff Atenolol 25 md qd and opined as follows: "... probably draw a thyroid profile on her and check her CBC. Assuming that this is all normal I don't think anything further needs to be done." (R. 150).

The record contains numerous reports of visits by the Plaintiff with Dr. Marie Michel of the Primary Care Center at Hollywood, from November 17, 2005 to August 8, 2008. Treatment notes reveal that 13 of the 15 visits to the Primary Care Center, the Plaintiff reported no pain. Additionally, normal edema in her extremities and normal musculo/skeletal; uncontrolled diabetes and hypertension; and controlled hyperlipidemia were noted in most of the treatment notes. (R. 139-145, 158-161, 178-182). The Plaintiff reported on November 17, 2005, September 14, 2006, and November 15, 2006 that she had difficulty swallowing. (R. 140, 141, 145).

On 2 of the 13 visits which reported "no pain," hand written notes from the doctor reveal that the Plaintiff complained of pain when walking, sitting for long hours, and in neck, shoulders and lower back. (R. 141, 178-179). On August 9, 2007, although the Plaintiff reported she was in pain and classified it a 7 on a scale of 1-10, she also stated her pain had improved since the previous year. (R. 159). In August, September and November 2007, the doctor advised the Plaintiff to be compliant with her medications. (R. 158, 160, 182). In November 2007, the Plaintiff complained that the medication was too expensive and the doctor changed it to Simvastatin, a more affordable one. (R. 182). On August 8, 2008, treatment notes reveal that the Plaintiff refused to see an endocrinologist and refused to take insulin on a regular sliding scale. (R. 178-179).

On June 28, 2006, Kenneth L. Jarolem, M.D., treating orthopedic surgeon, gave a final evaluation to the Plaintiff wherein he noted that Mitchell was under the care of an ENT specialist and

was undergoing a work-up for the dysphasia. (R. 194-195). Dr. Jarolem also noted that Mitchell continued to complain of neck pain and difficulty swallowing. Upon physical examination, Dr. Jarolem noted cervical tenderness, and concluded that she was at maximum medical improvement and noted her impairment rating as 16% for the four-level cervical diskectomy and fusion. He opined that her work status was at a sedentary level. (R. 195).

On April 10, 2007, the Plaintiff was seen by Dr. Mian A. Hasan of the Florida Heart Specialists. Dr. Hasan noted the Plaintiff was found with an abnormal EKG, however, she denied any chest pain, palpitations or dizziness. Mitchell had limited mobility due to neck pain, but otherwise her musculoskeletal revealed no edema, clubbing or cycnosis, and she had no sensory or motor defecits neurologically. (R. 189-190). On April 17, 2007, a nuclear cardiac stress test found no evidence of stress induced ischemia, no wall motion abnormality, and normal ejection fraction. (R. 192).

The Plaintiff was seen by an optometrist at the Primary Care Center on April 13, 2007, and there were no apparent problems, except for poor lid closure OS due to Bell's Palsy. (R. 191). Additionally, laboratory results from September 5, 2007, March 18, 2008 and July 1, 2008 show that the Plaintiff's hemoglobin A1C were 10.5, 8.8 and 9.8. (R. 172, 203, 212).

A Physical Residual Functional Capacity Assessment dated July 24, 2007, listed the primary diagnosis as cervical injury, diabetes, hypertension and Bells Palsy. (R. 236). The assessment found that the Plaintiff was able to occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds; stand/walk or sit for about 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (R. 237). There were no postural, manipulative, visual, communicative or environmental limitations noted. (R. 238-243). A second Physical Residual Functional Capacity Assessment, dated October 15, 2007, made identical findings. (R. 245-252).

After a hearing and review of the record, the ALJ issued an opinion finding that the Plaintiff had the following severe impairments: neck disorder, degenerative disc disorder, hypertension and diabetes. The ALJ also found that the Plaintiff did not have an impairment or combination of impairments that meets or equals a listing. The ALJ determined that the Plaintiff retained the residual functional to perform a minimally reduced range of light work. (R. 16). The ALJ found that the Plaintiff could not return to her past relevant work as a nurse aide/home health aide, but based on the Plaintiff's age, education, work experience, and RFC, there were other jobs which existed in significant numbers in the national economy which the Plaintiff could perform. (R. 19). The ALJ concluded that the Plaintiff was not disabled within the meaning of the Social Security Act. (R. 20).

## II. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Foote v. Chater, 67 F.3d 1553 (11th Cir. 1995); Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988). The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See, Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). The court may not reweigh evidence or substitute its judgment for that of the ALJ, and

even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See, Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Baker v. Sullivan, 880 F.2d 319 (11th Cir. 1989).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. See, 20 C.F.R. section 404.1520; 20 C.F.R. section 416.920 (a)-(f).

The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. section 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If such a finding is not made, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. section 404.1520(c).

At step three, the ALJ compares the claimant's severe impairments to those in the listing of impairments. 20 C.F.R. section 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. See, Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are

awarded. 20 C.F.R. section 404.1520(d).

Step four involves a determination of whether the impairments prevent the claimant from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show, at step five, that there is other work available in the national economy which the claimant can perform. 20 C.F.R. section 404.1520(e)-(f).

The claimant bears the initial burden of proving that she is unable to perform previous work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The inability to perform previous work relates to the type of work performed, not to merely a specific prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

The Plaintiff's first point of contention is that the ALJ failed to develop a full and fair record by failing to order a Residual Functional Capacity Assessment from any treating or examining physician; by rejecting the medical opinions of the non-examining State Agency physicians; and by not seeking the advice or testimony of a Medical Expert.

It is the duty of the ALJ to fully and fairly develop the record. See, Graham v. Apfel, 129 F.3d 1420, 1422-1423 (11th Cir. 1997). Development of a full record may include ordering a consultative examination to enable the ALJ to make an informed decision. Holladay v. Bowen, 848 F.2d 1206, 1209 (11th Cir. 1988); West v. Barnhart, 300 F.Supp.2d 1264, 1271 (S.D. Fla. 2003). The applicable regulations also provide that a consultative examination may be obtained "when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision" on the claim. 20 C.F.R. §404.1519a. The ALJ is also obligated to make every reasonable effort to obtain all medical evidence necessary from the claimant's treating physician to make a determination. See, Sellers v. Barnhart, 246 F.Supp.2d 1201, 1210 (M.D. Ala. 2002); 20 C.F.R. §404.1512(d).

With regard to the Plaintiff's RFC, the ALJ determined as follows:

> The undersigned considered the opinions the State agency medical consultants who provided physical residual functional capacity assessment at the initial and reconsideration levels. The reviewing physicians found that the claimant was capable of performing at the medium exertional level. However, the undersigned finds that State agency consultants did not adequately consider the claimant's subjective complaints or the combined effect of the claimant's impairments. Therefore, the undersigned accords little weight to the opinion in regards to the claimant being able to physically [] perform at the medium exertional level.
>
> Having reviewed the evidence of record, testimony, and the treating and examining source opinions, the undersigned finds that the claimant's residual functional capacity is consistent with a minimally reduced range of light work.

(R. 19).

In reviewing the ALJ's residual functional capacity determination, this Court finds it is not supported by substantial evidence. This Court agrees with the Plaintiff that the determination made by the ALJ is unclear. As set out above, the Plaintiff was seen at the Primary Care Center for over 2 1/2 years. However, Dr. Michel, the Plaintiff's treating physician, was not contacted to opine on the Plaintiff's "severe combination of impairments" or to complete a Physical RFC Assessment. Additionally, the ALJ failed to address Dr. Jarolem's determination that the Plaintiff was at maximum medical improvement at an impairment rating of 16% for the four-level cervical diskectomy and fusion. Under these circumstances, this Court cannot find that the showing of not disabled is proper, and therefore, a remand on this basis is proper.

This determination also impacts the second argument raised by the Plaintiff concerning the credibility finding by the ALJ, since the RFC determination was based in part on the ALJ's credibility analysis. Nonetheless, this Court will discuss the Plaintiff's second argument below.

The Plaintiff's second point of contention is that the ALJ improperly discredited the Plaintiff's

pain testimony. Specifically, the Plaintiff asserts that the ALJ misrepresented key portions of the Plaintiff's testimony and failed to investigate the cause of the Plaintiff's non-compliance with her medications.

It is well established that pain alone can be disabling. Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987); Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987). However, the claimant's testimony of pain or other subjective symptoms standing alone, are not conclusive evidence of disability. See, Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987). A three part standard that must be applied to evaluate a claimant's complaints of pain or other subjective symptoms has been established by the Eleventh Circuit. This standard requires (1) evidence of an underlying medical condition, and (2) either (a) objective medical evidence to confirm the severity of the alleged pain or symptom arising from that condition, or (b) evidence that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptom. See, Dyer v. Barnhart, 395 F.3d 1206 (11th Cir. 2005); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).

If an ALJ rejects a claimant's testimony on credibility grounds, the ALJ must explicitly state as much and give adequate reasons for that determination. Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995). There is no requirement that the ALJ refer to every piece of evidence, but the credibility determination must not be "merely a broad rejection." Dyer, 395 F.3d at 1211. Failure to state a reasonable basis for rejecting such testimony mandates that the testimony of the claimant be accepted as true "as a matter of law." Holt, 921 F.2d at 1223.

In addressing the Plaintiff's credibility, the ALJ noted as follows:

> In addition, there is evidence that the claimant has not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with his application.

> ...
>
> As per activities of daily living, the claimant has provided inconsistent information regarding daily activities. On October 3, 2007 (exhibit 6E), the claimant described daily activities, which are fairly limited; however, at the hearing she testified that she goes shopping, sweeps, goes to church, drives and drove herself to the hearing. Moreover, she had her disk fusion on September 2005 and after the surgery, she took care or assisted in the care of her older son who was injured in an accident, which can be quite demanding both physically and emotionally. Further, she was paid under the workers compensation program (exhibits 3D, 3D & 4D) until March 2007, when he moved to a different location. Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

(R. 17-18).

The findings by the ALJ appear to be based, in part, on his reliance that the Plaintiff was engaged in shopping, sweeping, attending church and driving. However, this conclusion is not supported by the record. The testimony presented at the hearing regarding the Plaintiff's ability to do household chores is at odds with the ALJ's conclusion. The Plaintiff testified that she "sometimes" goes grocery shopping and sweeps, however, it is her daughter who does the heavy household work. (R. 36-37). The Plaintiff also testified that she attends church, but no further questions were asked to clarify the frequency with which she attends or the length of time she is there. (R. 39). Additionally, the ALJ stated that Mitchell cared for her injured older son, "which can be quite demanding both physically and emotionally." (R. 18). However, the Plaintiff specifically stated at the hearing that she cared for her older son by making his doctor's appointment and his child support payments. Mitchell's older son's physical needs were met by a nurse who came daily to care for him. (R. 39-40).

Similarly, the findings related to the Plaintiff's non-compliance in taking her medication is at

odds with the testimony presented by the Plaintiff and with parts of the medical records. This Court finds that the ALJ failed to properly analyze the Plaintiff's non-compliance in taking her medication with her complaints of not being able to swallow and not being able to inject herself. Accordingly, a remand on this basis is warranted.

This Court cannot find on the record that an award of benefits to the Plaintiff is required, but does recommend that the decision by the ALJ be REVERSED and the cause REMANDED for proceedings consistent with this Report and Recommendation, specifically, for the ALJ to re-evaluate the credibility determination and make a proper residual functional capacity assessment.

### III. CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that the decision issued by the ALJ determining that the Plaintiff was able to perform a minimally reduced range of light work is not supported by substantial evidence and that the correct legal standards were not applied. Therefore, it is the recommendation of this Court that the decision of the Commissioner be REVERSED AND REMANDED for further proceedings. Accordingly, the Motion for Summary Judgment filed by the Plaintiff (D.E. #16) should be **GRANTED, in part** and the Motion for Summary Judgment filed by the Defendant (D.E. #19) should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this __19__ day of April, 2010.

_____
ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE